[Civ. No. 15761. Fourth Dist., Div. Two. Nov. 4, 1976.]

DAVID W. WHEELER et al., Plaintiffs and Appellants, v.
ST. JOSEPH HOSPITAL et al., Defendants and Respondents.

COUNSEL

Richard M. Hawkins for Plaintiffs and Appellants.

Moore, Graves & Madory, Richard E. Madory, Ruston, Nance, McCormick & DiCaro, Ruston, Nance & DiCaro, Donald A. Ruston, Steve D. Hillyard, Beam & Ure, Beam, Ure, Barbaro & Brobeck, David G. Ure and Bonne, Jones & Bridges for Defendants and Respondents.

OPINION

TAMURA, J.—Plaintiffs (David and Margaret Wheeler, husband and wife) were compelled to submit their alleged medical malpractice claims against defendants to arbitration. The arbitration proceedings resulted in an award in favor of defendants and against plaintiffs. This appeal presents two basic issues: (1) Whether there was an enforceable agreement to arbitrate and (2) whether the award should have been vacated by reason of nondisclosure by the medical member of the arbitration panel of a business relationship with the firm of attorneys representing one of the doctor defendants.

FACTS

The pertinent facts giving rise to this appeal are as follows:

At about 7:55 p.m. on April 27, 1971, Mr. Wheeler was admitted to defendant St. Joseph Hospital (hospital) for an angiogram and catheterization studies in connection with a coronary insufficiency. On the following morning, shortly after the tests were performed, Mr. Wheeler suffered a brain stem infarction rendering him a total quadriplegic with inability to speak or otherwise communicate except with his eyes.

In March 1972, plaintiffs filed an action against the hospital and the doctors who performed the medical tests. Mr. Wheeler sought damages for the injuries sustained as a result of defendants' alleged medical malpractice and Mrs. Wheeler joined in the action seeking damages for loss of the services and consortium of her husband and damages for emotional distress from having allegedly witnessed the infliction of the injuries upon her husband.

On November 20, 1972, the hospital filed a petition (noticed for hearing on Dec. 1, 1972) for an order compelling plaintiffs to arbitrate their claims.[1] The petition alleged that when Mr. Wheeler was admitted to the hospital on April 27, 1971, he signed a form entitled "CONDITIONS OF ADMISSION" which included a paragraph entitled "ARBITRATION OPTION";[2] the latter paragraph provided that if the patient does not agree to the "ARBITRATION OPTION" he must either place his initials in the space provided on the form or, in the alternative, notify the hospital in writing within 30 days of his discharge of his election not to agree to arbitration; Mr. Wheeler failed to exercise his option not to agree to arbitration, either by placing his initials in the space provided on the admission form or by notifying the hospital within 30 days of his discharge; the hospital served a written demand for arbitration on all parties to the action; the doctors have agreed to submit to arbitration but plaintiffs have refused; although Mrs. Wheeler was not a signatory to the admission form, she should be bound by the "ARBITRATION OPTION" because her claims are based upon and arise out of her husband's cause of action.

[1]The hospital had previously filed an answer to plaintiffs' complaint and as one of its affirmative defenses alleged its right to compel arbitration of the controversy.

[2]The hospital's admission form consisted of a single sheet, the top portion of which was for the insertion of statistical information concerning the patient and the remainder of which consisted of several numbered paragraphs under the title "CONDITIONS OF ADMISSION," which read as follows:

"CONDITIONS OF ADMISSION

"1. MEDICAL AND SURGICAL CONSENT: The patient is under the control of his attending physicians and the hospital is not liable for any act or omission in following the instructions of said physicians, and the undersigned consents to any X-ray examination, laboratory procedures, anesthesia, medical or surgical treatment or hospital services rendered the patient under the general and special instructions of the physician. The undersigned recognizes that all doctors of medicine furnishing services to the patient, including the radiologist, pathologist, anesthetist and the like are independent contractors and are not employees or agents of the hospital.

"It is understood that this hospital is a teaching institution and that unless the hospital is notified to the contrary in writing, the patient may participate as a teaching subject in the Medical Education Program of the institution.

"There are certain types of operations and procedures, such as direct abortion, which are not authorized in this hospital and I agree to such policy as a condition of admission.

"RELEASE OF INFORMATION: The hospital may disclose all or any part of the patient's record to any person or corporation which is or may be liable under a contract to the hospital or to the patient or to a family member or employer of the patient for all or part of the hospital's charge, including, but not limited to, hospital or medical service companies, insurance companies, workmen's compensation carriers, welfare funds, or the patient's employer.

"3. PERSONAL VALUABLES: It is understood and agreed that the hospital maintains a safe for the safekeeping of money and valuables and the hospital shall not be liable for the loss or damage to any money, jewelry, glasses, dentures, documents, furs, fur coats and fur garments or other articles of unusual value and small compass, unless placed

On November 29, 1972, the attorneys for the doctors served and filed with the trial court a document reciting that the doctors agreed to submit the controversy to arbitration and joined in the hospital's petition.

Plaintiffs interposed a number of objections to the petition to compel arbitration including the contention that there was no enforceable agreement to arbitrate.[3] Plaintiffs filed a declaration by Mrs. Wheeler in which she stated she was with her husband at all times during the period he was being processed for admission to the hospital; her husband signed the admission form without reading it; no one at the hospital called their attention to the "ARBITRATION OPTION," either before or after husband signed the document, and neither was aware of its existence; plaintiffs were never provided with a copy of the admission form; she first learned of the provision when her attorney informed her that the hospital was attempting to compel arbitration.

therein, and shall not be liable for loss or damage to any other personal property, unless deposited with the hospital for safekeeping.

"4. GENERAL DUTY NURSING: The hospital provides only general duty nursing care. Under this system nurses are called to the bedside of the patient by a signal system. If the patient is in such condition as to need continuous or special duty nursing care, it is agreed that such must be arranged by the patient, or his legal representative, or his physician(s), and the hospital shall in no way be responsible for failure to provide the same and is hereby released from any and all liability arising from the fact that said patient is not provided with such additional care.

"5. FINANCIAL AGREEMENT: The undersigned agrees, whether he signs as agent or as patient, that in consideration of the services to be rendered to the patient, he hereby individually obligates himself to pay the account of the hospital in accordance with the regular rates and terms of the hospital. Should the account be referred to an attorney for collection, the undersigned shall pay reasonable attorney's fees and collection expenses. All delinquent accounts bear interest at the legal rate.

"ARBITRATION OPTION: Any legal claim or civil action in connection with this hospitalization, by or against hospital or its employees or any doctor of medicine agreeing in writing to be bound by this provision, shall be settled by arbitration at the option of any party bound by this document in accordance with the Commercial Arbitration Rules of the American Arbitration Association and with the Hospital Arbitration Regulations of the California Hospital Association (copies available on request at the hospital admission office), unless patient or undersigned initials below or sends a written communication to the contrary to the hospital within thirty (30) days of the date of patient discharge.

"If patient, or undersigned, does not agree to the 'Arbitration Option,' then he will initial here._____

"The undersigned certifies that he has read the foregoing, receiving a copy thereof, and is the patient, or is duly authorized by the patient as patient's general agent to execute the above and accept its terms.

"DATE 4/21/71 TIME 7:55 p.m. PATIENT'S SIGNATURE [s] David W. Wheeler

"WITNESS [s] Illegible IDENT.A.BAND BY Initials illegible"

[3] On November 27, 1972, Mrs. Wheeler was appointed guardian ad litem for her husband on the ground he was incompetent. Immediately thereafter her attorney notified

Following a hearing on the petition, the court ordered all parties to the action to arbitrate the controversy "in accordance with the provisions of their agreement dated April 27, 1971."[4] The matter thereafter proceeded to arbitration hearings before a panel composed of one doctor, one lawyer, and one businessman. Following hearings, an award was made in favor of defendants and against plaintiffs.

Plaintiffs filed a petition to vacate the award on all of the grounds specified in Code of Civil Procedure section 1286.2 and on the further ground that the court abused its discretion in ordering arbitration. Defendants countered with a petition for confirmation of the award. The court denied the motion to vacate and ordered confirmation. Plaintiffs appeal from the judgment on the order confirming the award, the order confirming the award, and the order denying the motion to vacate the award.[5]

Plaintiffs assail the judgment and the arbitration award on several grounds but their two main attacks are: (1) The court erred in compelling plaintiffs to submit their claims to arbitration and (2) the award should have been vacated because the medical member of the arbitration panel failed to disclose facts which created an impression of possible bias. For the reasons which follow, we have concluded that plaintiffs' contentions must be upheld and that the judgment must be reversed.

I

## THE ORDER COMPELLING ARBITRATION

(a) *Reviewability of the Order*

Preliminarily, we dispose of defendants' contentions relating to the reviewability of the order compelling arbitration.

---

the hospital in writing that plaintiffs elected not to be bound by the "ARBITRATION OPTION." This was urged as one of the grounds in opposition to the petition to compel arbitration.

[4]Plaintiffs filed a motion for a new trial but the record before us does not disclose its disposition. Defendants state that the motion was taken off calendar at plaintiffs' request but the record before us does not include a copy of an order to that effect.

[5]Plaintiffs also purport to appeal from the order compelling arbitration. However, the order compelling arbitration is nonappealable and the attempted appeal therefrom is dismissed.

■ Defendants urge that by proceeding to arbitration, plaintiffs waived their right to attack the order. The contention is without merit. While an order denying a petition to compel arbitration is expressly made appealable (Code Civ. Proc., § 1294, subd. (a)), an order compelling arbitration is nonappealable. (*Bertero* v. *Superior Court,* 216 Cal.App.2d 213, 222 [30 Cal.Rptr. 719]; *Laufman* v. *Hall-Mack Co.,* 215 Cal.App.2d 87, 88 [29 Cal.Rptr. 829, 94 A.L.R.2d 1068].) The rationale behind the rule making an order compelling arbitration nonappealable is that inasmuch as the order does not resolve all of the issues in controversy, to permit an appeal would delay and defeat the purposes of the arbitration statute. (*Spence* v. *Omnibus Industries,* 44 Cal.App.3d 970, 976 [119 Cal.Rptr. 171]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 56, p. 4070.) However, a party compelled to arbitrate is entitled to have the validity of the order reviewed on his appeal from a judgment confirming an award. (*Stermer* v. *Modiano Constr. Co.,* 44 Cal.App.3d 264, 270 [118 Cal.Rptr. 309]; *Lesser Towers, Inc.* v. *Roscoe-Ajax Constr. Co.,* 271 Cal.App.2d 675, 692 [77 Cal.Rptr. 100]. Cf. *Titan Enterprises, Inc.* v. *Armo Construction, Inc.,* 32 Cal.App.3d 828, 831 [108 Cal.Rptr. 456].) In exceptional situations, a party aggrieved by an order compelling arbitration may seek appellate review of the order by a petition for writ of mandate (*Gunderson* v. *Superior Court,* 46 Cal.App.3d 138, 140 [120 Cal.Rptr. 35]; *Bertero* v. *Superior Court, supra,* 216 Cal.App.2d 213, 222), but failure to pursue that remedy does not preclude review of the order on an appeal from the confirmation judgment. (*Stermer* v. *Modiano Constr. Co., supra,* 44 Cal.App.3d 264, 270.)

Defendant hospital makes the further contention that plaintiffs are estopped from attacking the order compelling arbitration because they requested their new trial motion to be taken off calendar and caused the order compelling arbitration "to be entered" and notice thereof to be given to the parties. This contention is likewise without merit. In the first place, while we have no reason to doubt the accuracy of the hospital's allegations, there is nothing in the record before us substantiating them. But even assuming that plaintiffs took the procedural steps mentioned by the hospital, they are not thereby precluded from attacking the validity of the order compelling arbitration. An error of law may ordinarily be raised on appeal even though a new trial motion has not been made. (*Mendoyoma, Inc.* v. *County of Mendicino,* 8 Cal.App.3d 873, 877-878 [87 Cal.Rptr. 740]; *Schmidt* v. *Macco Construction Co.,* 119 Cal.App.2d 717, 721 [260 P.2d 230].) The present case does not fall within any known exception to the foregoing rule. The record discloses that plaintiffs

challenged the power of the court to compel arbitration at every available opportunity; they raised that issue in their opposition to the petition to arbitrate, in their motion to vacate the award, and in their opposition to the petition for confirmation. They are thus not precluded, either by waiver or estoppel, from challenging the validity of the order compelling arbitration.

We thus turn to the merits of plaintiffs' contention that the court erred in compelling them to submit their claims to arbitration.

(b) *Was there an enforceable agreement to arbitrate?*

In order to focus upon the precise issue presented by this appeal, we point out at the outset what issues are not involved. This appeal does not involve the question whether a hospital may validly require a patient to agree in advance, as a condition of admission, to arbitrate any malpractice claim that might arise out of the hospitalization. There is nothing in the record to show, and plaintiffs do not contend, that defendant hospital would have denied Mr. Wheeler admission if he had declined to agree to the "ARBITRATION OPTION." Nor is the substantive validity, as distinguished from enforceability, of a patient's agreement with a hospital to submit possible future medical malpractice claims to arbitration an issue. Although an exculpatory clause exacted by a hospital as a condition of admission has been held to be void as being against public policy (*Tunkl* v. *Regents of University of California,* 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]), there is no rule or public policy against an agreement between a patient and a hospital to arbitrate any medical malpractice claim arising out of the hospitalization. (See *Madden* v. *Kaiser Foundation Hospitals,* 17 Cal.3d 699, 706-709 [131 Cal.Rptr. 882, 550 P.2d 1178]; *Doyle* v. *Giuliucci,* 62 Cal.2d 606, 610 [43 Cal.Rptr. 697, 401 P.2d 1]: Code Civ. Proc., § 1283.1.[6]) The only issue confronting us with respect to arbitrate-ability is whether, under the facts and circumstances of the instant case, plaintiffs agreed to arbitrate the controversy.

---

[6]Code of Civil Procedure section 1283.1 provides:

"(a) All of the provisions of Section 1283.05 shall be conclusively deemed to be incorporated into, made a part of, and shall be applicable to, every agreement to arbitrate any dispute, controversy, or issue arising out of or resulting from any injury to, or death of, a person caused by the wrongful act or neglect of another.

"(b) Only if the parties by their agreement so provide, may the provisions of Section 1283.05 be incorporated into, made a part of, or made applicable to, any other arbitration agreement."

In resolving that question, we start with the basic premise that arbitration is consensual in nature. The fundamental assumption of arbitration is that it may be invoked as an alternative to the settlement of disputes through the judicial process "solely by reason of an exercise of choice by [all] parties." (Henderson, *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice,* 58 Va.L. Rev. 947, 985.) In other words, a party cannot be compelled to arbitrate a dispute he has not agreed to submit. (*Steelworkers* v. *Warrior & Gulf Co.,* 363 U.S. 574, 582-583 [4 L.Ed.2d 1409, 1417-1418, 80 S.Ct. 1347]; *Freeman* v. *State Farm Mut. Auto. Ins. Co.,* 14 Cal.3d 473, 479 [121 Cal.Rptr. 477, 535 P.2d 341]; *Pacific Inv. Co.* v. *Townsend,* 58 Cal.App.3d 1, 9 [129 Cal.Rptr. 489]; *Windsor Mills, Inc.* v. *Collins & Aikman Corp.,* 25 Cal.App.3d 987, 993-994 [101 Cal.Rptr. 347].) Our arbitration statute codifies the foregoing principle by expressly providing that "the court shall order [the parties] to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists. . . ." (Code Civ. Proc., § 1281.2.) Thus, in ordering plaintiffs to submit to arbitration, the court below necessarily found that an agreement to arbitrate existed.[7] If the court erred in this respect, an essential jurisdictional fact was missing and the order compelling arbitration would have constituted an abuse of discretion.

In the factual context of the instant case, two important and competing public policy considerations must be weighed and applied in determining whether there was an agreement to arbitrate. On the one hand there is a strong judicial policy favoring arbitration and on the other there is an equally strong judicial concern for the rights of consumers of goods and services against whom unexpected or oppressive provisions of standardized contracts are sought to be enforced. (*Spence* v. *Omnibus Industries, supra,* 44 Cal.App.3d 970, 974.)

■ It has long been the public policy of this state to favor arbitration over litigation as a means of settling disputes because it is expeditious, avoids the delays of litigations, and relieves court congestion.[8] (*Madden* v. *Kaiser Foundation Hospitals, supra,* 17 Cal.3d 699, 706-707; *Lewsadder*

---

[7]In the case at bench, no findings were made in connection with the order compelling arbitration. Since findings are required in arbitration matters only where the order is made appealable (Code Civ. Proc., § 1291) and since the order compelling arbitration is nonappealable, findings were not required.

[8]Court congestion is a matter of major concern to the bench and bar as well as to the public. The policy favoring arbitration is reflected in the new Judicial Arbitration Rules for Civil Cases recently adopted by the Judicial Council pursuant to new Code of Civil Procedure section 1141.10. (Rule 1601 et seq., Cal. Rules of Court, eff. July 1, 1976.)

v. *Mitchum, Jones & Templeton, Inc.,* 36 Cal.App.3d 255, 259 [111 Cal.Rptr. 405]; *Player* v. *Geo. M. Brewster & Son, Inc.,* 18 Cal.App.3d 526, 534 [96 Cal.Rptr. 149]. See *Pacific Inv. Co.* v. *Townsend, supra,* 58 Cal.App.3d 1, 9; *Crofoot* v. *Blair Holdings Corp.,* 119 Cal.App.2d 156, 183-184 [260 P.2d 156].) The policy favoring arbitration extends to its use in the settlement of medical malpractice claims. (*Madden* v. *Kaiser Foundation Hospitals, supra,* 17 Cal.3d 699, 708-709; *Doyle* v. *Giuliucci, supra,* 62 Cal.2d 606, 610; Code Civ. Proc.; § 1283.1.)

However, notwithstanding the cogency of the policy favoring arbitration and despite frequent judicial utterances that because of that policy every intendment must be indulged in favor of finding an agreement to arbitrate, the policy favoring arbitration cannot displace the necessity for a voluntary agreement to arbitrate. (See *Player* v. *Geo. M. Brewster & Son, Inc., supra,* 18 Cal.App.3d 526, 534.) As our Supreme Court recently observed: "There is indeed a strong policy in favor of enforcing agreements to arbitrate, but there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate. . . ." (*Freeman* v. *State Farm Mut. Auto. Ins. Co., supra,* 14 Cal.3d 473, 481.) And it has been held that to be enforceable, an agreement to arbitrate must have been "openly and fairly entered into." (*Player* v. *Geo. M. Brewster & Son, Inc., supra,* 18 Cal.App.3d 526, 534; *Windsor Mills, Inc.* v. *Collins & Aikman Corp., supra,* 25 Cal.App.3d 987, 993-994.)

In determining whether plaintiffs in the case at bench entered into an agreement to arbitrate, principles governing enforcement of contracts of adhesion come into play. ▆ The term "adhesion contract" refers to standardized contract forms offered to consumers of goods and services on essentially a "take it or leave it" basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing in the form contract. (*Smith* v. *Westland Life Ins. Co.,* 15 Cal.3d 111, 122, fn. 12 [123 Cal.Rptr. 649, 539 P.2d 433]; *Steven* v. *Fidelity & Casualty Co.,* 58 Cal.2d 862, 882 [27 Cal.Rptr. 172, 377 P.2d 284]; *Spence* v. *Omnibus Industries, supra,* 44 Cal.App.3d 970, 973-974.) The distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms. (*Smith* v. *Westland Life Ins. Co., supra,* 15 Cal.3d 111, 122, fn. 12; *Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d 862, 882; see Kessler, *Contracts of Adhesion, Some Thoughts About Freedom of Contracts,* 43 Colum.L.Rev. 629, 632; Slawson, *Mass Contracts: Lawful Fraud in California,* 48 So.Cal.L.Rev. 1, 47.)

A hospital's standard printed "CONDITIONS OF ADMISSION" form possesses all the characteristics of a contract of adhesion. (*Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d 92, 101-102; Henderson, *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice, supra,* 58 Va.L.Rev. 947, 988.) As the court stated in *Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d at page 102: "The would-be patient is in no position to reject the proffered agreement, to bargain with the hospital, or in lieu of agreement to find another hospital. The admission room of a hospital contains no bargaining table where, as in a private business transaction, the parties can debate the terms of their contract. As a result, we cannot but conclude that the instant agreement manifested the characteristics of the so-called adhesion contract. . . ."

However, a determination that a contract is adhesive is merely the beginning and not the end of the analysis insofar as enforceability of its terms is concerned. Enforceability depends upon whether the terms of which the adherent was unaware are beyond the reasonable expectations of an ordinary person or are oppressive or unconscionable. "'In dealing with standardized contracts, courts have to determine what the weaker contracting party could legitimately expect by way of services according to the enterpriser's "calling" and to what extent the stronger party disappointed reasonable expectations based on the typical life situation.'" (*Gray* v. *Zurich Insurance Co.,* 65 Cal.2d 263, 270 [54 Cal.Rptr. 104, 419 P.2d 168], quoting Kessler, *Contracts of Adhesion, Some Thoughts about Freedom of Contracts, supra,* 43 Colum.L.Rev. 629, 637. See also Henderson, *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice, supra,* 58 Va.L.Rev. 947, 991-992.) A provision which limits the duties or liability of the stronger party will not be enforced against the forced adherent absent "plain and clear notification" of the terms and an "understanding consent" thereto. (*Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d 862, 883; *Bauer* v. *Jackson,* 15 Cal.App.3d 358, 370 [93 Cal.Rptr. 43]. See *Smith* v. *Westland Life Ins. Co., supra,* 15 Cal.3d 111, 122-123; McCall, *Repossession and Adhesion Contracts,* 26 Hastings L.J. 383, 417-418.)

The application of adhesion contract principles to an arbitration clause in a contract for medical services presents distinct problems concerning the patient's awareness of the contractual provision and his understanding assent thereto. As Professor Henderson points out in his comprehensive article entitled *Contractual Problems in the Enforcement*

*of Agreements to Arbitrate Medical Malpractice, supra,* 58 Va.L.Rev. 947, at page 987: "Given the distinctive nature of the medical services transaction, the use of a standardized form runs the risk of failing to satisfy the policy of awareness. The arbitration provision, viewed from the perspective of the patient, is indeed subsidiary to the primary exchange of medical services for an undertaking of payment. After consenting to medical procedures, the contract purchaser of medical services may fairly assume that no obligations other than that of payment are imposed. Absent some guidance by the medical entity, the patient has little reason to know anything at all about arbitration, let alone that the tendered document requires it. Nor should the medical entity ordinarily expect a patient to read or even to understand a broad arbitration clause. In these circumstances a court is faced with the question of whether the patient is nevertheless bound by the term since he knew that the writing was used to embody contract terms. In resolving that question, a consideration peculiar to all executory arbitration agreements may well be weighted heavily in the medical context. Not only is the resisting party (presumably the patient) claiming lack of knowledge of the arbitration term, but he asks not to be prevented from litigating a consequential loss controversy that was also unknown and nonexistent at the time of contracting. Viewed in this light, the knowledge factor is doubled in its impact." (Fns. omitted.)

Professor Henderson sees no reason why an arbitration agreement in the medical malpractice context should not be enforced provided the patient is afforded the opportunity to exercise a "real choice" in selecting arbitration as an alternative to litigation and suggests that "[r]easonable disclosure or explanation, coupled with some opportunity to read the term, will go far to minimize claims of bargaining disadvantage. . . ." (Henderson, *supra,* 58 Va.L.Rev. 947, 995.) He concludes that medical enterprises should employ "meaningful drafting and sensible marketing techniques" and "[a]bove all else, industry practices must create not only the impression that malpractice arbitration furthers the interests of the medical patient, but that the *patient himself exercises a real choice* when he waives access to the courts."[9] (At p. 998; italics added.)

[9]In 1975 the Legislature attempted to deal with the problems presented by this appeal by enacting Code of Civil Procedure section 1295 (eff. Sept. 24, 1975). The section provides in pertinent part:

"(a) Any contract for medical services which contains a provision for arbitration of any dispute as to professional negligence of a health care provider shall have such provision as the first article of the contract and shall be expressed in the following language: 'It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or

Defendants urge that the "ARBITRATION OPTION" paragraph of the hospital's admission form was conspicuous, clear and unambiguous and rely on the general proposition that ordinarily when a person with the capacity to read and understand an instrument signs it, he may not, in the absence of fraud, imposition, or excusable neglect, avoid its terms on the ground he failed to read it before signing it. (*Bauer* v. *Jackson, supra,* 15 Cal.App.3d 358, 370, and cases there cited. See *Federico* v. *Frick,* 3 Cal.App.3d 872, 875 [84 Cal.Rptr. 74].) Apart from the fact, as we explain in a subsequent portion of this opinion, that the "ARBITRATION OPTION" paragraph of defendant hospital's admission form is neither clear nor unambiguous, the general proposition that a person who signs a contract is bound by all of its terms even though he signed it without reading it may not be given full sweep where the contract is one of adhesion. (*Bauer* v. *Jackson, supra,* 15 Cal.App.3d 358, 370.) Where the contract is one of adhesion, conspicuousness and clarity of language alone may not be enough to satisfy the requirement of awareness. Where a contractual provision would defeat the "strong" expectation of the weaker party, it may also be necessary to call his attention to the

unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.'

"(b) Immediately before the signature line provided for the individual contracting for the medical services must appear the following in at least 10-point bold red type:

" 'NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.'

"(c) Once signed, such a contract governs all subsequent open-book account transactions for medical services for which the contract was signed until or unless rescinded by written notice within 30 days of signature. Written notice of such rescission may be given by a guardian or conservator of the patient if the patient is incapacitated or a minor.

"(d) Where the contract is one for medical services to a minor, it shall not be subject to disaffirmance if signed by the minor's parent or legal guardian.

"(e) Such a contract is not a contract of adhesion, nor unconscionable nor otherwise improper, where it complies with subdivisions (a), (b) and (c) of this section."

It is interesting to note that one commentator on the subject of arbitration in the medical malpractice context has cautioned that even under the new code section there should not only be compliance with the statutory specifications as to the form and content of the contract but that *"development of specific procedures in obtaining execution of arbitration agreements is absolutely essential to their validity."* (Butler, *Arbitration: An Answer to the Medical Malpractice Crisis?* 9 Bev.Hills Bar J. 41, 75; original italics.)

Since the new code section is not involved in the instant case, we, of course, express no opinion on the question whether the section effectively overcomes all of the problems presented by this appeal.

language of the provision. (*Smith* v. *Westland Life Ins. Co., supra,* 15 Cal.3d 111, 122-123.) And if the language of such provision is too complicated or subtle for an ordinary layman to understand, he should also be given a reasonable explanation of its implications. (See *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, 270-271; *Steven* v. *Fidelity & Casualty Co., supra,* 58 Cal.2d 862, 870-872; Henderson, *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice, supra,* 58 Va.L.Rev. 947, 995; McCall, *Repossession and Adhesion Contracts, supra,* 26 Hastings L.J. 383, 417-419; Slawson, *Mass Contracts: Lawful Fraud in California, supra,* 48 So.Cal.L.Rev. 1, 17-18.[10])

Those requirements are particularly compelling in the context of an arbitration clause incorporated as a part of a hospital's "CONDITIONS OF ADMISSION" form. To the ordinary person, admission to a hospital is an anxious, stressful, and frequently a traumatic experience. As Professor Henderson has observed, the hospital can hardly expect the patient to read the printed conditions on an admission form, much less understand the meaning of a broad arbitration clause. Ordinarily a patient is directed by his treating doctor to be admitted to the hospital where the doctor enjoys staff privileges. Unless advised by his doctor to the contrary, the patient normally feels he has no choice but to seek admission to the designated hospital and to accede to all of the terms and conditions for admission, including the signing of all forms presented to him. Medical malpractice, much less arbitration of a medical malpractice claim, would hardly be a subject that enters the patient's mind. A patient may reasonably expect "CONDITIONS OF ADMISSION" to pertain to an agreement to abide by hospital rules and regulations and to the obligation to pay for the services rendered by the hospital but he would hardly expect his signature to an admission form to be taken as an

---

[10] Professor Slawson urges: "[D]ecisions like *Thompson* v. *Occidental Life Insurance Co.,* [9 Cal.3d 904 (109 Cal.Rptr. 473, 513 P.2d 353)] in which the California Supreme Court held that a standard form will not be given an otherwise unexpected construction against the interests of a consumer unless the language is 'conspicuous, unambiguous and unequivocal . . . [such that] an ordinary layman can understand,' ought to be interpreted with the following in mind: no matter how unambiguous and unequivocal the language in the form, the form should still not be considered the consumer's contract unless the language was brought to his attention before he chose to buy. This is the meaning which should be given to 'conspicuous.' Moreover, if the implications of the language were too complicated or too subtle for an ordinary layman to understand in the time he reasonably could be expected to devote to understanding them, the language still should not be considered part of the contract unless these implications also were fully explained to the buyer before he chose to buy. This is the meaning which should be given to '[such that] an ordinary layman can understand.'" (Slawson, *Mass Contracts: Lawful Fraud in California, supra,* 48 So.Cal.L.Rev. 1, 17-18.)

agreement to give the hospital as well as "any doctor" the option to compel arbitration of a malpractice claim.

The manifest objective of a medical entity in including an arbitration clause is to avoid a jury trial and thereby hopefully minimize losses for any medical malpractice and correspondingly to hold down the amount of any recovery by the patient. (See Henderson, *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice, supra,* 58 Va.L.Rev. 947, 994, and particularly fn. 194.) Although an express waiver of jury trial is not required (*Madden v. Kaiser Foundation Hospitals, supra,* 17 Cal.3d 699, 713-714), by agreeing to arbitration, the patient does forfeit a valuable right. The law ought not to decree a forfeiture of such a valuable right where the patient has not been made aware of the existence of an arbitration provision or its implications. Absent notification and at least some explanation, the patient cannot be said to have exercised a "real choice" in selecting arbitration over litigation. We conclude that in order to be binding, an arbitration clause incorporated in a hospital's "CONDITIONS OF ADMISSION" form should be called to the patient's attention and he should be given a reasonable explanation of its meaning and effect, including an explanation of any options available to the patient. These procedural requirements will not impose an unreasonable burden on the hospital. The hospital's admission clerk need only direct the patient's attention to the arbitration provision, request him to read it, and give him a simple explanation of its purpose and effect, including the available options.[11] Compliance will not require the presence of the hospital's house counsel in the admission office.

In the case at bench, the uncontradicted evidence shows that Mr. Wheeler was unaware of the existence of the "ARBITRATION OPTION" provision. Mrs. Wheeler's declaration states that her husband signed the admission form without reading it; that the hospital personnel did not call their attention to the "ARBITRATION OPTION" paragraph, much less explain its implication or the options available to Mr. Wheeler; and that plaintiffs were never provided with a copy of the document. The hospital has never disputed the fact that its personnel never called plaintiffs' attention to the arbitration clause, either before or after hospitalization,

---

[11]Code of Civil Procedure section 1295 enacted by the Legislature in 1975 to avoid some of the problems raised by this appeal may satisfy the requirements of awareness and understanding by requiring medical arbitration agreements to be expressed in the statutory language and form which sets forth a simple and straightforward explanation of the meaning and effect of arbitration.

or that plaintiffs were not provided a copy of the "CONDITIONS OF ADMISSION."

Defendants contend that Mrs. Wheeler's statement that her husband signed the document without reading it constituted inadmissible opinion evidence and must be disregarded. The contention is without merit. A nonexpert may give testimony in the form of an opinion where it is "rationally based on the perception of the witness" and is "helpful to a clear understanding of his testimony." (Evid. Code, § 800.) Whether a person signed a document without reading it is an inference which may rationally be drawn by a percipient witness to the circumstances surrounding the event.

Although the admission form purported to give the patient the option of not agreeing to arbitration, the existence of that option was neither called to plaintiffs' attention nor were they told that an exercise of that option would not preclude admission to the hospital. Based upon all of the uncontradicted facts and circumstances of the case at bench, we conclude that the court erred in impliedly finding that an agreement to arbitrate existed.

Defendants rely on *Federico* v. *Frick,* 3 Cal.App.3d 872 [84 Cal.Rptr. 74], as their principal authority for the enforceability of the "ARBITRATION OPTION." They urge that the case stands for the proposition that an arbitration clause in an adhesion type contract is enforceable even though the forced adherent signed the contract without reading it. In that case the owner of a restaurant and cocktail lounge employed a musician by signing a standardized employment contract prepared by a musicians' local of which the employee was a member. The contract contained a clause providing that all controversies arising out of the employment would be submitted to arbitration before a panel to be designated by the union in accordance with its by-laws. Upon his discharge from employment, the employee filed a claim against the restaurant owner through the union. Arbitration hearings resulted in an award. On the appeal from an order confirming the award, the owner raised the contention, among others, that the arbitration clause was unenforceable because the employment contract was adhesive as to him. He claimed that he signed the contract without reading it and was unaware of the arbitration clause. The reviewing court summarily dismissed the contention with the following comment: "The standard union employment contract before us may well be a contract of adhesion

[ct. om.], but there is nothing in the record providing evidentiary support for this conclusion. Furthermore, in this state arbitration is entirely a creature of statute and is a favored method for the expeditious settlement of disputes. [Cts. om.]" (At p. 875.)

*Federico* is inapposite. The result reached in that case is not inconsistent with the reasonable expectation test. It is not unreasonable to hold that an arbitration clause ought to be within the range of expectation of a businessman signing a standard employment contract form prepared by a labor union of which the employee whom he hires is a member. In light of the widespread use of arbitration in settlement of contract disputes in the commercial world and particularly in the labor relations field, the arbitration clause in the employment contract involved in *Federico* can properly be said to be within the reasonable expectations of the employer. (See *Madden* v. *Kaiser Foundation Hospitals, supra,* 17 Cal.3d at p. 708.) Furthermore, while arbitration of a claim for damages for an alleged breach of contract may not be inherently unfair or prejudicial to the rights of either party, in the case at bench we are concerned with a tort claim which may involve the right to compensation for harm to the claimants' intangible interests such as pain and suffering, disfigurement, emotional distress, etc. That the right to a jury trial is far more valuable to a tort claimant than to one claiming damages for breach of contract is evidenced by the fact that most litigated breach of contract cases are tried to the court rather than to a jury while personal injury claims are generally tried to a jury. Finally, insofar as awareness is concerned, the atmosphere of the employer's office in *Federico* is a far cry from that of a hospital admission room.[12]

*Doyle* v. *Giuliucci, supra,* 62 Cal.2d 606, also relied upon by defendants, did not reach the issue presented on this appeal. *Doyle* involved an arbitration clause in a prepaid health care contract. The only issue before the court was whether the clause was applicable to a medical malpractice claim of a minor whose parent contracted for the services. The court held that the clause was applicable, reasoning that parents

---

[12]Though not cited by defendants, we note that an arbitration clause in an application for membership in a stock exchange was upheld in *Frame* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 20 Cal.App.3d 668 [97 Cal.Rptr. 811]. The court held that "assuming that the contract was adhesory, it is not shown that arbitration would be contrary to the reasonable expectations of any party or that any loss or unfair imposition would result. Therefore, no basis exists in the present case for using the doctrine of adhesion contracts to avoid arbitration." (At p. 672.) Our comments concerning the relevancy of *Federico* v. *Frick, supra,* 3 Cal.App.3d 872, to the instant case are equally applicable to *Frame.*

must possess authority to contract in behalf of their minor children if the latter group is to be accorded the benefits of group medical services. (62 Cal.2d at p. 608.) *Doyle* did not involve the question whether the contract for prepaid medical services was adhesive; the issue was never mentioned.

Nor is the Supreme Court's recent decision in *Madden ·v. Kaiser Foundation Hospitals, supra,* 17 Cal.3d 699, dispositive of the issue before us. The critical question in *Madden* was whether the state retirement board, as agent for state employees, had implied authority to enter into an agreement to amend the group health care contract with Kaiser to provide that arbitration would be the sole method of adjudicating malpractice disputes between Kaiser and state employees. Plaintiff argued that a provision for arbitration operated to establish an extraordinary method of resolving disputes and that consequently an agent must be held to have exceeded his normal powers when he agrees to bind his principal to an arbitration provision without the latter's express consent. The court observed that the perimeters of an agent's authority are established by Civil Code section 2319 which empowers a general agent "To do everything necessary or proper and usual . . . for effecting the purpose of his agency." After canvassing the evolution of judicial attitude towards arbitration, the court declared: "The agent today who consents to arbitration follows a 'proper and usual' practice 'for effecting the purpose' of the agency; he merely agrees that disputes arising under the contract be resolved by a common, expeditious, and judicially favored method." (17 Cal.3d at p. 707.) The court, therefore, concluded that plaintiff's contention was without merit.

The court was similarly unpersuaded by plaintiff's contention that relief from the arbitration provision was mandated by principles governing enforceability of adhesion contracts: Plaintiff alleged that the arbitration provision could not be enforced because it was inconspicuous, unexpected and disrupted plaintiff's reasonable expectation that malpractice disputes would be decided by a jury, not a panel of arbitrators. The court observed that the legal rules which operate to absolve a party from the consequences of provisions contained in a contract of adhesion have focused upon terms imposed by a party with superior bargaining power which unexpectedly and often unconscionably limit the obligations or liabilities of the stronger party. (17 Cal.3d at p. 711.) The court held that these principles were inapposite because the Kaiser agreement had none of the features associated with an adhesion contract.

The court reasoned that an arbitration provision in a group plan could not be said to exceed plaintiff's reasonable expectations when provisions for arbitration had become a common feature of collective bargaining agreements. Further, the contract at issue had been negotiated by parties of equal bargaining strength. There could be no danger of overreaching when plaintiff, through the retirement board, had possessed bargaining strength superior to that which she could exert on her own behalf. (17 Cal.3d at p. 711.) Nor was the element of adhesion present in the Kaiser plan. The board had engaged several other medical plans some of which did not call for arbitration; the plaintiff was, therefore, free to enroll in these other plans or go outside the state sponsored plans and secure health insurance on her own behalf. The court concluded that since the Kaiser plan lacked the earmarks of a contract of adhesion, principles governing standardized contracts were inapplicable. (17 Cal.3d at pp. 710-712.)

In light of *Madden*'s emphasis on the strong policy favoring arbitration of medical malpractice claims, its pronouncement that arbitration is a "proper and usual" means of resolving such disputes, and its observation that arbitration does not constitute a limitation on the obligations or liabilities of the stronger party, it might be argued that an arbitration clause in a hospital admission form signed by a patient should be enforceable even though the patient was unaware of the provision or its consequences. In our opinion, *Madden* does not compel that conclusion.

The court in *Madden* did not hold that arbitration of medical malpractice claims was a proper and usual means of resolving these disputes such that an arbitration provision in a form contract could never be said to exceed a party's reasonable expectations. In evaluating the inclusion of an arbitration provision, the court stressed the fact that in group contracts negotiated by elected representatives, it is customary for the negotiators to agree to arbitration as a means of resolving disputes arising under the contract. It was in that context that the court declared it was "proper and usual" in effecting the purpose of the agency—contracting for *group* medical services—for the board to agree to arbitration of malpractice claims by the members of the group. We do not believe the court's "proper and usual" analysis was intended to mean that arbitration is the "usual" method by which medical malpractice claims are being resolved. As Justice Mosk observes in his dissent, "arbitration may be a 'proper' scheme for settling malpractice disputes but it is not the 'usual' or 'ordinary' method. The normal, usual, ordinary, most frequently employed, commonly accepted means of resolving malpractice

controversies is litigation in a court of law, with its due process protections and constitutional guarantee of a trial by jury." (17 Cal.3d 699 at p. 717.)

There are additional factors which persuade us that the contract at bench is more similar to the contract of adhesion in *Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d 92 (see p. 357, *ante*) than to the negotiated contract in *Madden.* Mr. Wheeler did not enjoy the prerogative of choice possessed by the plaintiff in *Madden*; realistically, he had no opportunity to choose among various "CONDITIONS OF ADMISSION" so that he could secure a trial by jury. Nor did Mr. Wheeler have a choice among hospitals similar to the option enjoyed by the plaintiff in *Madden* to go beyond the plans offered by the state and to contract for health services on his own behalf. A patient like Mr. Wheeler realistically has no choice but to seek admission to the hospital to which he has been directed by his physician and to sign the printed forms necessary to gain admission. To posit otherwise would require us to ignore the stress, anxiety, and urgency which ordinarily beset a patient seeking hospital admission.

Finally, unlike the situation in *Madden,* Mr. Wheeler was not represented by a state agency which could neutralize the advantage in bargaining power enjoyed by the defendant hospital. The contract between Mr. Wheeler and the hospital was not arrived at after arduous bargaining between parties of equal strength. Instead it was hurriedly signed under the stressful atmosphere of a hospital admitting room without any procedures calculated to alert the patient to the existence of the "ARBITRATION OPTION." Nor was the patient given a copy of the agreement to permit him to study its terms under less anxious circumstances. Under these facts, we have no difficulty in concluding that the instant agreement is closer to the adhesion contract found in *Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d 92, 102, than it is to the negotiated contract in *Madden.*

As we said at the outset, arbitration is consensual in nature; there must be an agreement to arbitrate "openly and fairly" entered into. While *Madden* emphasizes the desirability of arbitration over litigation as a means of settling disputes, including medical malpractice claims, there must still be an agreement to arbitrate. In *Madden* the existence of the agreement turned on the authority of the agent; in the case at bench, it turns on the assent of plaintiffs. *Madden* does not alter our conclusion

that in the circumstances of the case at bench, there was no valid assent on the part of plaintiffs to the "ARBITRATION OPTION" in the hospital's "CONDITIONS OF ADMISSION." Weighing the policy favoring arbitration against the policy sought to be furthered by the concept of adhesion contracts, the latter should not be submerged by the former. The doctrine that one who signs a contract is bound by all of its terms should not be extended to bind a patient to an arbitration provision incorporated in a hospital's "CONDITIONS OF ADMISSION" form where the patient's attention has not been called to the provision and a reasonable explanation given of its meaning.

(b) *Was the "ARBITRATION OPTION" paragraph of the admission form clear and unambiguous?*

While we have concluded that the court erred in compelling arbitration because there was no showing of a valid assent on the part of plaintiffs to arbitrate, the "ARBITRATION OPTION" was also too uncertain and ambiguous to constitute an agreement to arbitrate insofar as defendant doctors are concerned.

■ One of the legal consequences that a draftor of an adhesion type contract must anticipate is that ambiguities in its terms will be resolved against the party who prepared the contract. (*Slobojan* v. *Western Travelers Life Ins. Co.,* 70 Cal.2d 432, 440 [74 Cal.Rptr. 895, 450 P.2d 271]; *Ransom* v. *Penn. Mutual Life Ins. Co.,* 43 Cal.2d 420, 424 [274 P.2d 633]; *Spence* v. *Omnibus Industries, supra,* 44 Cal.App.3d 970, 974; *Neal* v. *State Farm Ins. Cos.,* 188 Cal.App.2d 690, 695 [10 Cal.Rptr. 781].) The instant "ARBITRATION OPTION" contains a number of ambiguities and uncertainties which, if interpreted against defendants, would render plaintiffs' claims against the doctors beyond the scope of arbitration.

■ In the first place, the paragraph makes no express mention of medical malpractice claims; it simply refers generally to "any legal claim or civil action in connection with this hospitalization." While to one trained in the law the clause "any legal claim or civil action" may fairly and reasonably be seen as including medical malpractice claims, an ordinary person, even if he read the paragraph, might well assume that it only related to disputes over hospital bills. (See Henderson, *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice, supra,* 58 Va.L.Rev. 947, 975.) More importantly, to a lay person the phrase "in connection with this hospitalization" could reasonably be

interpreted to refer only to claims arising out of services rendered by the hospital, not medical malpractice committed by the patient's doctor.

Furthermore, the phrase "any doctor of medicine agreeing in writing to be bound by this provision" is ambiguous and uncertain. It is uncertain as to when and how the agreement is to be manifested. In the case at bench so far as the present records show, the only attempt by defendant doctors to avail themselves of the option did not occur until long after plaintiffs filed their action and then only by having their attorneys serve and file a document with the court stating that the doctors "do hereby agree to arbitrate the above matter and join" in the petition to compel arbitration. At oral argument, defendants represented that all of the doctors having staff privileges at the hospital, including defendant doctors, had signed a document previously filed with the hospital, signifying their agreement to arbitration of any malpractice claims. Plaintiffs were never apprised of that fact nor does the "ARBITRATION OPTION" provision indicate that all doctors having staff privileges had already agreed to the "ARBITRATION OPTION" provision.

Resolving the ambiguities in favor of the patient, the "ARBITRATION OPTION" should not extend to malpractice claims against "any doctor of medicine" absent some explanation to the patient at the time he signed the admission form of the intended scope of the arbitration provision. The evidence is uncontradicted that no such explanation was given in the instant case.

In concluding this section of our opinion, we make the following comments concerning the dissent's attack upon our analysis and conclusion. The crux of the dissent is the assertion that the record contains "substantial evidence that Mr. Wheeler read, signed, and understood the agreement to arbitrate." The assertion is premised solely on the fact that Mr. Wheeler's signature appears just below a recital in the document stating that "The undersigned certifies that he has read the foregoing, receiving a copy thereof, . . . and accept its terms." The dissent states that "the law is fairly clear" that this may be considered as evidence that Mr. Wheeler read and understood the "ARBITRATION OPTION" provision in the printed form but cites no authorities in support of the statement other than a case reciting the settled proposition that *ordinarily* one who signs a contract is bound by its terms even though he signs it without reading it. As we have already explained, that principle is inapplicable to adhesion type contracts. Indeed, if a self-serving recital in a standardized

printed form contract that one who signs the document has read it and agrees to be bound by its terms has the legal effect advocated by the dissent, we might as well forget about the doctrine of contracts of adhesion.

Even assuming that there is a presumption that one who signs a contract has read it (see *Constantian* v. *Mercedes-Benz Co.,* 5 Cal.2d 631, 634 [55 P.2d 841]; *Taussig* v. *Bode & Haslett,* 134 Cal. 260, 266 [66 P.2d 259]), in the case at bench plaintiffs produced uncontradicted evidence that Mr. Wheeler did not read the printed form, that his attention was never directed to the existence of the "ARBITRATION OPTION" provision, and that neither he nor Mrs. Wheeler were ever provided with a copy of the document. Our Evidence Code adopts the Thayer-Wigmore view on presumptions: "A presumption is not evidence." (Evid. Code, § 600; see Witkin, Cal. Evidence (2d ed. 1966) § 217, pp. 197-198.) The presumption, if there was one, that Mr. Wheeler read the document (which is not a presumption that he understood its terms) was merely a presumption affecting the burden of producing evidence (Evid. Code, § 603) and as such was dispelled by direct uncontradicted evidence of the nonexistence of the fact presumed (Evid. Code, § 604; cf., *LeGrand* v. *Yellow Cab Co.,* 8 Cal.App.3d 125, 132 [87 Cal.Rptr. 292].)

## II

### POSSIBLE BIAS OF ARBITRATOR

■ As an independent basis for reversal of the judgment, plaintiffs contend that the court erred in denying their motion to vacate the arbitration award on the ground the medical member of the arbitration panel failed to disclose an employment relationship with the firm of attorneys representing the principal doctor defendant. For the reasons to be stated, we have concluded that this contention must be upheld.

The facts pertinent to this issue are as follows:

Plaintiffs' medical malpractice action named as defendants the St. Joseph Hospital, Dr. Villalobos (Mr. Wheeler's treating physician) and Dr. Dorsey (the doctor who assisted Dr. Villalobos in the performance of the tests). The law firm of Ruston, Nance, McCormick & DiCaro (hereafter Ruston & Nance) represented Dr. Villalobos both in the malpractice action and in the arbitration proceedings.

The "Arbitration Option" provided that all claims shall be arbitrated pursuant to the rules of the American Arbitration Association. Those rules provide that where the dispute involves a medical malpractice claim, the arbitration panel shall be composed of one medical doctor, one lawyer and one businessman. In the case at bench, Dr. Homer L. Elmquist was designated as the medical member of the panel. The arbitration hearings were held from December 9 through December 12, 1974, and from April 21 through April 25, 1975.

One of the grounds on which plaintiffs moved to vacate the award was that Dr. Elmquist had failed to disclose the fact that after he had been named as a member of the arbitration panel, he rendered professional services on behalf of the firm of Ruston & Nance in connection with the defense of a personal injury action pending in Los Angeles County. Plaintiffs' motion on this ground was supported by a copy of a report dated November 29, 1974, from Dr. Elmquist to Ruston & Nance setting forth his diagnosis and opinion concerning the condition of a Mr. Edward A. Chase whom he had examined on November 27, 1974, and by a certified copy of the minutes of the proceedings in the Superior Court of Los Angeles County in Edward A. Chase v. Armco Steel Corp. et al., showing Ruston & Nance as attorneys for the defendants and Dr. Homer L. Elmquist as having testified for the defense in that case on December 18, 1974.

In the court below, defendants responded to the foregoing attack on the award by arguing that the evidence adduced by plaintiffs respecting the relationship between Dr. Elmquist and Ruston & Nance was hearsay and should be disregarded. However, at oral argument before this court, Mr. Ruston, with commendable candor, voluntarily conceded that Dr. Elmquist had indeed been employed by his firm and did testify for the defense in the superior court case in Los Angeles County on the date set forth in the certified copy of the minute order of that court. Mr. Ruston explained that this unfortunate occurrence was simply the result of one member of a large firm not being aware of what another member was doing in an unrelated case. Being aware of the fine reputation enjoyed by the law firm of Ruston & Nance, we have no hesitancy in accepting Mr. Ruston's explanation. The employment of Dr. Elmquist was undoubtedly the result of inadvertence and not done knowingly or intentionally for the purpose of attempting to influence the doctor's vote in the instant arbitration proceeding. Nevertheless, on the basis of the admitted facts, the award must be vacated.

In *Commonwealth Corp.* v. *Casualty Co.,* 393 U.S. 145 [21 L.Ed.2d 301, 89 S.Ct. 337], the United States Supreme Court announced the principle that an arbitrator's failure to disclose to the parties "any dealings that might create an impression of possible bias" is a ground for vacation of an award under the federal statute. The federal statute specifies the following as being grounds for vacation of an award: "(a) Where the award was procured by corruption, fraud, or undue means. (b) Where there was evident partiality or corruption in the arbitrators, or either of them." (9 U.S.C.A. § 10.) *Commonwealth* held that the foregoing provisions indicate a Congressional desire to provide "not merely for *any* arbitration but for an impartial one" and that the broad statutory language should be construed to require arbitrators to disclose to the parties "any dealings that might create an impression of possible bias." (393 U.S. 145 at pp. 147, 149 [21 L.Ed.2d 301 at pp. 304-305, 89 S.Ct. 337 at pp. 338, 339]; original italics.) The court held that the failure on the part of one of the arbitrators to disclose a substantial business relationship with one of the parties constituted cause for vacation of the award even though there was no proof of actual fraud, corruption or bias on the part of the arbitrator. In reaching its conclusion, the court, speaking through Justice Black, referred to the rules of the American Arbitration Association requiring arbitrators to disclose "any circumstances likely to create a presumption of bias or which he believes might disqualify him as an impartial Arbitrator" (American Arbitration Association Rules, § 18), and to the Canon of Judicial Ethics requiring a judge to be " 'particularly careful to avoid such action as may reasonably tend to awaken the suspicion that his social or business relations or friendships, constitute an element in influencing his judicial conduct.' " (393 U.S. 145 at pp. 149-150 [21 L.Ed.2d 301 at p. 305, 89 S.Ct. 337 at pp. 339-340].) Justice Black observed that while arbitrators cannot be expected to sever all ties with the business world because they do not make their living out of deciding cases, the court should nevertheless "be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review." (393 U.S. 145 at p. 149 [21 L.Ed.2d 301 at p. 305, 89 S.Ct. 337 at p. 339].)

The principle enunciated in *Commonwealth* has been adopted as a valid basis for the vacation of an award under our arbitration statute. (*Johnston* v. *Security Ins. Co.,* 6 Cal.App.3d 839, 842-843 [86 Cal.Rptr. 133].) As *Johnston* pointed out, the pertinent language of our statute is almost identical to that of the federal statute. Code of Civil Procedure

section 1286.2 provides that an award may be vacated if the court determines that: "(a) The award was procured by corruption, fraud or other undue means; (b) There was corruption in any of the arbitrators; ..." We are in full accord with the *Johnson* court. The *Commonwealth* principle is based on sound policy considerations and should be applied in the interpretation of our arbitration statute.

In the case at bench, in light of the fact that the dispute involved a medical malpractice claim, the nature of the relationship between the medical member of the arbitration panel and the law firm representing one of the principal defendants manifestly gave rise to "an impression of possible bias." If arbitration of medical malpractice claims is to be encouraged, as we believe it should, any appearance of possible bias on the part of an arbitrator should be fully disclosed to the parties.

Nor is it any answer to say, as defendants argue, that inasmuch as the American Arbitration Association rules require only a majority vote of the arbitrators, the award should be upheld notwithstanding the disqualification of Dr. Elmquist for "an impression of possible bias" because the vote was unanimous. The arbitrators are not isolated from each other; they hear and decide the case as a panel after joint discussion, debate and deliberation. Each panel member has an opportunity to persuade the others. The views of a medical member of an arbitration panel deciding a medical malpractice claim can manifestly influence the vote of the nonmedical members.

We conclude that the award should have been vacated by reason of Dr. Elmquist's failure to reveal to the parties his relationship with the firm of Ruston & Nance. We hasten to add that we do not imply that Dr. Elmquist was guilty of any wrongdoing or that he was in fact biased or influenced by reason of the relationship. Nevertheless, as Justice Black emphasized in *Commonwealth,* such relationships must be disclosed to the parties if the integrity and effectiveness of the arbitration process is to be preserved.

## DISPOSITION

The judgment is reversed with directions to vacate the order confirming the arbitration award and the order compelling arbitration and to

conduct further proceedings not inconsistent with the views expressed in this opinion.

McDaniel, J., concurred.

**GARDNER, P. J.—**

I.

I dissent from that portion of the majority opinion which reverses the order of the trial court compelling arbitration.

I fault the majority opinion in five respects:

(1) It ignores applicable rules of appellate review.

(2) It fails to follow the controlling authority, i.e., *Madden* v. *Kaiser Foundation Hospitals,* 17 Cal.3d 699 [131 Cal.Rptr. 882, 550 P.2d 1178].

(3) It adds a new and crippling dimension to the concept of arbitration.

(4) It takes an entirely unrealistic approach to the rules concerning contracts of adhesion.

(5) It is wrong.

Other than the above, it is a fine opinion—scholarly and well written.

A.

### THE RULES OF APPELLATE REVIEW

This is a reviewing court, not a trial court. As I view our position in the judicial hierarchy, the trial court makes decisions and we review them. If we are going to make the decisions, we might as well do away with the trial courts and try all cases as original proceedings and save the taxpayers a heap of money. As an unreconstructed trial judge, I am a firm believer in the substantial evidence rule and in the rules governing the review of exercise of discretion on the part of trial courts. I spent

many years on the playing field. Now that I am up here in the press box, I consider these rules to be our basic tools—not handy little gadgets that a result-oriented reviewing court can whimsically use or ignore to fit its idea of a proper result. When we ignore these rules any appearance of continuity or permanence in the law is superficial. Law becomes the subjective preference of the reviewing court.

Although there was no oral testimony, the substantial evidence rule is still applicable. The trial court was faced with contradictory declarations and documents and it was that court's responsibility, not ours, to determine any conflicts in fact. There is a presumption that the judgment of the trial court is correct and we are supposed to indulge in all inferences, intendments and presumptions to support the trial court. Thus, in this case, there is a clear conflict on the issue of whether Mr. Wheeler read and understood the conditions of admission. Mrs. Wheeler said he did not and from this the majority says that the evidence is uncontradicted that Mr. Wheeler was unaware of the arbitration option provision in that document. Quite the contrary. Mr. Wheeler's signature appears about an inch from that provision and even closer to his signature is the statement that he has "read the foregoing" and received a copy of it. Since that document is evidence, a clear conflict in the evidence exists and we are bound by the trial court's implied finding that Mr. Wheeler did read and sign the document. On this point the law is fairly clear. A person with the capacity to read and understand an instrument may not in the absence of fraud, imposition or inexcusable neglect avoid its terms on the ground that he failed to read it before he signed it. He is bound by its terms. One who assents to a contract is bound by its provisions and cannot complain of unfamiliarity with the language of the instrument. (*Federico* v. *Frick*, 3 Cal.App.3d 872 [84 Cal.Rptr. 74]; 1 Witkin, Summary of Cal. Law (8th ed.) p. 93.)

While the clear distinction is never made in the majority opinion, I gather it avoids the substantial evidence rule by finding as a matter of law that an enforceable agreement to arbitration did not exist. However, to establish something as a matter of law, the state of the record must be such that no other reasonable conclusion is legally deducible from the evidence and any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it on appeal.

(*McBride* v. *Atchison, Topeka & S.F. Ry. Co.,* 44 Cal.2d 113, 116 [279 P.2d 966].) In view of Mr. Wheeler's signature on the document, it cannot be said as a matter of law that he did not read it, sign it and understand it. Of course, his wife said that he did not read it. Considering the posture of this case, this comes as no surprise. Had Mr. Wheeler testified, I imagine that he, too, would have said that he did not read the document. However, the trial court was not bound by Mrs. Wheeler's testimony and we cannot find as a matter of law that her testimony prevails.

Thus, there is in this record substantial evidence that Mr. Wheeler read, signed and understood the agreement to arbitrate. Under ordinary conditions he would be bound by it.

But, says the majority, the provision is neither clear nor unambiguous. I do not know what else it could say. It is brief, succinct and to the point. It is clear, unambiguous and unmistakable. It says that all claims against the hospital or any doctor in connection with this hospitalization are subject to arbitration. To me, that is fairly clear. I think that if I were not a lawyer and had read and signed it, I would understand it to say just what it says, i.e., that all disputes arising from the hospitalization are subject to arbitration. It is ambiguous only to someone who wants it to be ambiguous.

Thus, there is in the record substantial evidence that a contract to arbitrate existed.

The real question for review is whether the trial court abused its discretion in ordering the arbitration. In this connection, in spite of the majority opinion, arbitration is an accepted and favored method for the expeditious and economical settlement of disputes. (*Madden, supra,* pp. 706-710.) Once we have established that a valid agreement to arbitrate exists, it is difficult to find an abuse of discretion, i.e., that the decision of the trial court in ordering arbitration exceeded the bounds of reason. This arbitration provision does no more than specify the forum for the settlement of disputes. (*Doyle* v. *Giuliucci,* 62 Cal.2d 606 [43 Cal.Rptr. 697, 401 P.2d 1].) There was no abuse of discretion in ordering the parties to comply with this provision.

Therefore, under applicable rules of appellate review, substantial evidence supports the trial court's order compelling arbitration and there was no abuse of discretion in making such an order.

## B.

## MADDEN V. KAISER FOUNDATION HOSPITALS

*Madden* came down after the briefing in this case and I actually think that when the parties appeared for oral argument, the defendants thought they were home free and the plaintiff thought he had been shot down in flames. Not so. In this court a hospital admission agreement for arbitration is governed not by *Madden* but by the principles of *Tunkl* v. *Regents of University of California,* 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693], which has nothing to do with this case.

Here, I pause to express an admiration amounting almost to awe at the remarkable job that the majority has done on *Madden.* From my lowly place in the judicial pecking order, I have chafed from time to time at some of the opinions of our Supreme Court. Nevertheless, I never had the intestinal fortitude, let alone the skill or ability, to completely emasculate one. This, the majority has done to *Madden.* As it turns out, dissenting Justice Mosk (with a leg up from Professor Henderson) won this race going away and the majority were simply left at the starting gate. Justice Tobriner who wrote the majority opinion might just as well have stayed home that day. According to the majority, arbitration is *not* the "proper" or "usual" or "ordinary" (*Madden, supra,* pp. 706-710) scheme for settling malpractice claims. All *Madden* stands for is judicial approval of a contract between the State Employees Retirement System and the Kaiser Foundation Health Plan. All else was noncontrolling dicta—an abstract declaration of policy supportive of arbitration.

I am no fanatic about arbitration.[1] Nevertheless, considering the widespread public disillusionment with the ability of the courts to expediently settle disputes, there *is* widespread use of arbitration, conciliation and mediation. The directive spelled out in *Madden* is that there is a strong public policy in favor of arbitration which the courts are bound to follow and enforce.

The attitude of *Madden* versus the attitude of this court is epitomized in the following quotations, the first from *Madden,* the second from the majority opinion.

---

[1]As the author of *Spence* v. *Omnibus Industries,* 44 Cal.App.3d 970 [119 Cal.Rptr. 171], I took issue with the application of an agreement to arbitrate. All I got for my efforts was a nasty letter from some high panjandrum in the National Arbitration Association telling me I didn't understand beans about arbitration.

*Madden* says at pages 711-712: "Although plaintiff asserts that the arbitration amendment promotes Kaiser's interest to the disadvantage of the members enrolled under the Kaiser plan, she overlooks the benefits of the arbitral forum. The speed and economy of arbitration, in contrast to the expense and delay of jury trial, could prove helpful to all parties; the simplified procedures and relaxed rules of evidence in arbitration may aid an injured plaintiff in presenting his case. Plaintiffs with less serious injuries, who cannot afford the high litigation expenses of court or jury trial, disproportionate to the amount of their claim, will benefit especially from the simplicity and economy of arbitration; that procedure could facilitate the adjudication of minor malpractice claims which cannot economically be resolved in a judicial forum."

Compare that statement of policy re arbitration with that of the majority at page 361, *ante,*: "The manifest objective of a medical entity in including an arbitration clause is to avoid a jury trial and thereby hopefully minimize losses for any medical malpractice and correspondingly to hold down the amount of any recovery by the patient."

Of course, that is not what the Supreme Court says. But in arbitration agreements involving hospitalization, the majority apparently follows *Tunkl,* not *Madden.* I disagree. I agree with *Madden* that arbitration is widespread enough and well enough understood to be usual and accepted. It is a common, expeditious and, except in the Second Division of the Fourth District Court of Appeal, a judicially favored method of resolving disputes. I thought the Supreme Court in *Madden* spelled this out with some precision.

## C.

### ARBITRATION CONTRACTS

The majority has added a novel and, in my opinion, a crippling dimension to arbitration contracts, at least those involving malpractice claims. In addition to setting forth the agreement in writing for the reading, consideration and signature by the parties, the hospital (and I suppose any other entity involved in potential malpractice claims) must also give to the patient a reasonable explanation of its meaning and effect, including an explanation of "any options available to the patient." What a fruitful source of litigation! The reception clerk had better either

have a certified court reporter standing by or at least tape recording equipment for the necessary "explanation." The whole idea of written contracts is to avoid the problem of "explanations" or "understandings." If I were prone to hyperbole, I would opine that this rule deals a mortal blow to arbitration agreements under circumstances such as exist in this case. In every case we are going to have a slam-bang lawsuit over the existence, content and inadequacy of the explanation given by the reception clerk. Perhaps if both clerk and patient were represented by counsel it would be helpful. Under the majority rule, the execution of an arbitration agreement could well be compared to the taking of a plea of guilty in a criminal action.

D.

CONTRACTS OF ADHESION

Here, we are in a difficult field. Almost every written commercial transaction, except one hammered out by two lawyers representing two individuals of equal bargaining power, is in a broad sense, a contract of adhesion. Clearly, insurance policies and many, if not most, sales and financial contracts come within this principle. So, too, most other commonly used contractual and commercial arrangements involve documents drafted and imposed by the party enjoying superior bargaining strength. As a congenital nonreader of that which I sign, I deal with these every day. Credit cards, sales slips, work orders and even some hotel registration cards all contain written provisions prepared by the party with the superior bargaining power. I sign these blindly and they are binding on me. When I buy a share of capital stock of a corporation or a municipal bond, I accept a document which is in the rigid sense of the word an adhesion contract. However, I just can't see myself sitting down with the chairman of the board of General Motors and hammering out a stock certificate satisfactory to both parties. My point is that in our everyday life we deal constantly with documents which in a literal sense are contracts of adhesion. They are presented on a take it or leave it basis without opportunity for individual bargaining. However, it is only when such documents contain provisions which give the party with the superior bargaining power an unconscionable advantage that the strict rules governing contracts of adhesion come into play.

I will agree that by reason of a bunch of junk in this agreement of admission that document bears some of the indicia of a contract of

adhesion. I certainly agree that the admission room of a hospital is no bargaining area. Nevertheless, I cannot agree that Mr. Wheeler did not have an opportunity to exercise a "real choice" in selecting arbitration as an alternative to litigation. I do not agree that the language of this provision is so complicated or subtle that an ordinary layman could not understand it. I would point out that Mr. Wheeler was not entering the hospital under emergency conditions but for some tests. He had plenty of time to read and sign the document.

In addition, I would point out that this particular provision does not have the usual take it or leave it aspect. Specifically, the patient had his choice and if he did not want arbitration, he simply had to initial the form. As the majority notes, Mr. Wheeler was not going to be denied access to the hospital if he did not choose arbitration. He was given a simple, clear, unmistakable choice. All of this, as I have pointed out, exists about one inch from his signature. It was not buried in small print nor was it on the reverse side of a document. It was obvious and clear. As in *Madden,* this arbitration agreement bears equally on the hospital and the patient. It does not detract from the hospital's duty to use reasonable care in treating the patient. It does not limit its liability for any breach of this duty. It merely substitutes one forum for another. I do not agree that the principles governing contracts of adhesion render the order of the court rendering arbitration an abuse of discretion.

Thus, I would affirm the order of the court ordering arbitration.

## II.

However, I agree with the majority that it was an abuse of discretion to confirm the award. I would send the matter back for a new arbitration hearing. Due to an unfortunate set of circumstances, the original hearing must be set aside but I can certainly see no reason to now send the matter to the courts.

I agree with the majority that neither Mr. Ruston nor Dr. Elmquist intentionally did anything wrong. I am positive that Mr. Ruston did not even know of Dr. Elmquist's retention by his firm in an unrelated lawsuit. I share Mr. Ruston's distress at the unprovoked and unrestrained attack made upon his professional integrity by opposing counsel. It was completely unnecessary and cannot be excused as advocative zeal. I am just as positive that it never entered Dr. Elmquist's mind that he was

doing anything wrong. As the United States Supreme Court pointed out in *Commonwealth Corp.* v. *Casualty Co.*, 393 U.S. 145 [21 L.Ed.2d 301, 89 S.Ct. 337], arbitrators cannot be expected to sever all their ties with the business world since they do not receive all their income from deciding cases. Dr. Elmquist is apparently a professional medical witness, not a lawyer or a judge, and probably thought nothing at all of accepting an assignment from Mr. Ruston's office while acting as an arbitrator in this case. Nevertheless, it happened and with or without *Commonwealth* or *Johnston* v. *Security Ins. Co.*, 6 Cal.App.3d 839 [86 Cal.Rptr. 133], the facts create an impression of possible bias and the award must be set aside. Litigants are prone to paranoia. Judges (and many arbitrators, too) live an uneasy life because of this. We not only must avoid evil, we must avoid the appearance of evil.

Thus, I would affirm the order compelling arbitration and I would send the matter back for a new arbitration hearing.

Respondents' petitions for a hearing by the Supreme Court were denied January 19, 1977. Richardson, J., was of the opinion that the petition should be granted.