[Civ. No. 12192. Third Dist. June 28, 1971.]

J. C. PLAYER et al., Plaintiffs and Respondents, v.
GEO. M. BREWSTER & SON, INC., Defendant and Appellant.

**COUNSEL**

Borchard & Carlson and Gary Borchard for Defendant and Appellant.

Carr & Kennedy and Laurence Carr for Plaintiffs and Respondents.

**OPINION**

**PIERCE, P. J.**—Defendant Geo. M. Brewster & Son, Inc., a New Jersey corporation ("Brewster"), appeals from an order denying its petition to compel arbitration of the claim asserted by plaintiffs J. C. Player and John A. Bryant, a joint venture (hereinafter for our convenience referred to as "Player") against Brewster for breach of a subcontract agreement between them and denying its motion for a stay of proceedings pending arbitration. Plaintiffs are California citizens.

Brewster's contention is that under the terms of the subcontract agreement an arbitration clause is applicable, valid and specifically enforceable. We will find to the contrary.

### THE FACTS

Brewster, the New Jersey corporation, at all times relevant to these proceedings was qualified and licensed to do business as a general contractor in California. In May 1960 it entered into a contract as prime contractor with the Corps of Engineers, United States Army ("Owner"), to construct Black Butte Dam and apputenances near Stony Creek in Glenn and Tehama Counties. One of Brewster's subcontracts was with Player. It was executed in August 1960 and covered the mixing and delivery of concrete including the establishment of a "batch plant." The subcontract contemplated that Player's plant would be set up and become

operational by December 1960; that performance under the subcontract would commence on January 12, 1961.

After the subcontract was made and sometime prior to October 1960, an unstable rock and earth condition was discovered, uncontemplated by the contracting (and subcontracting) parties. Brewster, the prime contractor, applied for and received from Owner a change order, "Modification Order No. 6." An additional sum of $594,320.70 was allowed by Owner and paid to Brewester.

In the verified complaint later to be filed by Player against Brewster it is alleged that "[d]efendant at no time prior to the entry upon the job by plaintiff ever communicated to plaintiffs the specific terms of the above mentioned Memorandum Directives or the negotiations being entered into by the defendant and the Corps of Engineers," nor did it mention and include in the request for the modification order provision for the additional cost to and compensation due plaintiffs as a result of the modification.

The unstable rock conditions discovered, it is alleged, caused changes at "the tunnel portals of the outlet works," resulting in not only changes in construction "but the entire plan of installation and pouring of the tunnel was reversed and changed. Work was suspended and substantial and material changes were made in the construction plan. As a consequence thereof, plaintiffs were required to delay their performance at the request and direction of both the Corps of Engineers and defendant." According to the original time schedule Player was to have completed work under the subcontract on November 1, 1961. Because of the change, completion was delayed until February 11, 1963. Meanwhile, in January 1962 Player forwarded through Brewster a request from Owner for a change order. It alleged increased costs amounting to $195,068.50. Hearings were held but ultimately Player's claim against Owner was denied. Also a motion for reconsideration was denied. The Board of Contract Appeals held that Modification Order No. 6 had been intended to cover and had settled all claims arising from the changed soil conditions.

A demand was therefore made by Player against Brewster. The demand was denied. Paragraph 6 of the written subcontract makes provision for the extent of the liability of Brewster in connection with a subcontractor's claims for "DELAYS, CHANGES, ETC." We will refer to the terms of that paragraph below. We are more directly concerned with the provisions of the arbitration clause, paragraph 13 of the subcontract, and will quote it in the margin.[1]

---

[1]Paragraph 13 provides: "Any controversy or claim arising out of or relating to this Subcontract or the breach thereof, *except such claims as are to be presented*

The complaint was filed February 8, 1967. Process was served in due course. Brewster's demurrer raised the grounds argued on this appeal, that there was an agreement to arbitrate (see fn. 1), that there was no allegation in the complaint that arbitration had been had or that there had been a demand therefor. In its order overruling the demurrer the court pointed out that a motion to stay the action was the procedure favored by which to raise the contractual right and obligation to arbitrate. A demand was subsequently made by Brewster. Player replied, stating its refusal based upon its claim that the complaint filed came within an exception to the arbitration clause; also that defendant had waived its right to arbitration.

On July 6, 1967, Brewster filed a petition for an order compelling arbitration and for a motion staying proceedings pending arbitration. The petition complied with the provisions of Code of Civil Procedure section 1281.2, which provides (in part here material) for such a petition when there is a written agreement therefor, where the other party to the agreement refuses to arbitrate, and for an order commanding arbitration "if . . . [the court] determines that an agreement to arbitrate the controversy exists, unless it determines that: (a) The right to compel arbitration has been waived by the petitioner; or (b) Grounds exist for the revocation of the agreement."

After a hearing the trial court made a preliminary ruling, stating in part: "The said sub-contract was prepared wholly by Brewster. The defendant is a New Jersey Corporation and it is interesting to note that the arbitration clause in the contract seems to tend toward advantage to the defendant. This becomes apparent when it is considered that all of the

---

*to or are the responsibility of the Owner under the previous provisions of this Subcontract,* shall be settled by arbitration in accordance with the Laws of the State of New Jersey by a board of three arbitrators, the first to be appointed by the Contractor, the second to be appointed by the Subcontractor and the third to be appointed by the Assignment Judge of the Superior Court of New Jersey in and for the County of Bergen. The final determination or award shall be made in writing, signed by the said arbitrators or by any two of them, and shall be final and binding upon both parties. The arbitrators shall without delay, meet at such times and places in New Jersey as shall be mutually arranged by them and shall *proceed expeditiously to hear the testimony and the evidence upon the matters* involved until the same shall have been concluded. Within ten days after the conclusion of the taking of the testimony the arbitrators or any two of them shall sign and acknowledge in writing their award and findings and shall deliver two copies thereof to each of the parties involved in the dispute. The Contractor and the Subcontractor may mutually agree in writing to the extention [*sic*] of the time for the making of the award. The decision of any two of the three arbitrators shall be sufficient to the rendering of a final and binding decision in the controversy. Any award rendered by arbitration as aforesaid may be entered by either party as a judgment in the Superior Court of New Jersey in and for the County of Bergen." (Italics ours.)

work done was in the State of California, that the strict observance of the arbitration clause would require the plaintiffs to submit their cause to arbitrators the width of a continent away. It appears from some of the decisions in California that there is an inclination to limit the use of arbitration where the arbitration 'agreement' may give advantage to one party thereto. In this connection reference is made to Commercial Factors Corporation vs. Kurtzman Brothers (1955) *131* C.A.2d *133*.

"    .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"We turn now to the practical application of arbitration agreements. It must be borne in mind continuously that the agreement which is here before us has in what might be termed 'fine print' a provision for arbitration in the State of New Jersey. It would seem somewhat doubtful that as a practical matter of expediting determination of controversy a trip to New Jersey under all the circumstances would bring an early end to this proceeding. . . ."

The court in the instant case imposed conditions to a further order unnecessary to discuss here. Defendant Brewster agreed to one of those conditions—arbitration in California—but insisted that the third arbitrator must be one selected by the Superior Court of New Jersey in and for the County of Bergen (see fn. 1). The trial court then declined to order arbitration and this appeal followed.

### The Issue of Player's Failure to File a Response

■ Before discussing any substantive question regarding the applicability, validity or enforcement of the arbitration agreement, we consider a procedural issue raised by Brewster. It contends for the first time on appeal that Player is now barred from contesting this appeal because it did not file a formal response to Brewster's petition under section 1281.2. Brewster relies upon Code of Civil Procedure section 1290 which provides in effect that the allegations of a petition are deemed to be admitted "unless a response is duly served and filed." (See *Johnston* v. *Security Ins. Co.* (1970) 6 Cal.App.3d 839, 843 [86 Cal.Rptr. 133], petition to vacate award.) Section 1290 was enacted in 1961.

We do not question the wisdom of the enactment of section 1290. It complements Code of Civil Procedure section 1005.5 which provides that a motion is deemed to have been made on all of the grounds specified in the notice from the date the notice is served. This saves the trial court's time and also frames issues to the end that attention can be centered on controverted matters. But, as so frequently happens when century-old

procedural matters are changed (and changed only with respect to one type of motion out of hundreds), the section 1290 provision and the possible penalty it exacts can be a trap to the unwary practitioner who has failed to note the special provision.

In the matter before us Player escapes the snare. First and primarily, it escapes because, after what had gone before, the filing of a formal response would have been an idle and futile act to which courts of justice turn their backs. The purpose of the response is obviously to inform a moving party of the defenses he must prepare to meet. But that purpose had already been served here before the motion was made. Brewster had filed a demurrer raising inter alia the same ground—the existence of the arbitration agreement. The demurrer had been argued and Player had set forth its defenses then. The court overruled the demurrer, specifying that the issue of the existence of the arbitration agreement should be raised by following the provisions of title IX of part III of the Code of Civil Procedure relating to arbitration. Brewster had then made a demand for arbitration and Player had replied setting up its defenses a second time. It would have been useless redundancy to recite these defenses a third time. Brewster's attorney apparently so regarded it. A transcript of the hearing on the motion (petition) is before us. Player's defenses to arbitration, including the contention that its complaint was within the exception of the arbitration clause, were raised. Section 1290 was not mentioned. Under these circumstances we hold Brewster is estopped to assert it as a bar. It uses it merely as a device to prevent the merits of the issue from being aired. We borrow a quotation from *Auer* v. *Frank* (1964) 227 Cal.App. 2d 396, 405 [38 Cal.Rptr. 684, 8 A.L.R.3d 1108]: "[T]he instant case finds itself in the same posture as the cases which come under the time-honored rule that where the parties and the court proceed throughout the trial upon the theory that a certain issue is presented for adjudication, the doctrine of estoppel precludes either party from thereafter asserting that no such issue was in controversy, even though it was not actually raised by the pleadings. [Citations.]" (See generally 3 Witkin, Cal. Procedure, Appeal, § 96, pp. 2264-2265; *id.*, (1967 Supp.), p. 948, and authorities cited.) Although the rule of estoppel has generally been applied to the *trial* of a case, there is no reason why the rule should not be applicable in a hearing of this kind.

### The Issue of the Applicability of the Arbitration Agreement

The arbitration agreement of the subcontract contains the following exception which, if applicable here, makes all the rest of its provisions nugatory as applied to the controversy raised by Player's pleadings:

By its terms arbitration is not to apply to "such claims as are to be presented to or are the responsibility of the Owner under the previous provisions of this Subcontract . . . ." It is Player's contention that Brewster was obligated to include Player's claim in its presentation to Owner of the total extra work claim arising because of the discovered rock and earth conditions—i.e., the claim resulting in Modification Order No. 6. The subject matter of its complaint, it argues, was therefore a claim which was to have been "presented to . . . the Owner" and therefore outside the arbitration clause of the subcontract.

Brewster argues that paragraph 6 provides that the contractor, Brewster, "shall not be responsible . . . for delay, damage or extra cost to sub-contractor caused by the owner and any claim by sub-contractor for such damages caused by the owner is to be presented for determination to the owner by the contractor on behalf of sub-contractor at sub-contractor's request and expense." Brewster then postulates that Player is suing Brewster "for something that [Brewster] did or did not do" and not for "something the owner is allegedly responsible for."

Player counters by arguing that Brewster is attempting to separate its obligation *"for failing to present . . . [Player's] claim to the owner . . . [from] the obligation that is represented by the claim itself."*

The exception to the arbitration clause is at least ambiguous. To the interpretive argument made by Player, it may be noted that the exception is stated in the disjunctive, not the conjunctive. Excepted from arbitration are claims either "to be presented to the Owner" OR those which "are the responsibility of the Owner." It is entirely possible under the allegations of the complaint that the claim sued on could be within one category and not the other. It could be true that Owner because of Brewster's act or omission was no longer under an obligation to pay the claim but that it was, nevertheless, a "claim to be presented to the Owner" and that it had been Brewster's duty under the contract to present it.

In the interpretation of ambiguous or uncertain contracts "[t]he rule that any ambiguities caused by the draftsman of the contract must be resolved against that party . . . applies with peculiar force in the case of the contract of adhesion." (*Neal* v. *State Farm Ins. Co.* (1961) 188 Cal.App.2d 690, 695 [10 Cal.Rptr. 781].) A contract of adhesion has been defined as "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it. . . . [Citations.]" (Witkin, Summary of Cal. Law (1969 Supp.) Contracts, § 5, p. 2; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269-271 [54 Cal.Rptr. 104, 419 P.2d 168].) The subcontract before us has aspects of

a contract of adhesion. Rather than argue whether or not it is in "fine print," we will state that all of it is printed in either 9 or 10 point type[2] (except the special provisions necessarily typewritten to apply to this particular subcontract). As a whole it appears to be a "house attorney" prepared form intended by Brewster to be submitted to all of its subcontractors on a take-it-or-leave-it basis.

■ However, assuming *arguendo* that we misconstrue its true character, that it is not "adhesive," and that Player had a seat at the bargaining table with equal bargaining power, then we are very sure the exception clause was intended to say what Player contends it says—that all claims "to be presented to the Owner" were not claims intended to be sent back to New Jersey to be arbitrated—regardless of who ultimately was required to pay them.

### The Issue of the Validity and Enforcement of This Arbitration

Our conclusion that the exception to the arbitration clause in the subcontract is applicable should not be construed to indicate the finding by this court that the arbitration clause but for the exception would be either valid or enforceable.

■ The law favors contracts for arbitration of disputes between parties. They are binding when they are openly and fairly entered into and when they accomplish the purpose for which they are intended. Cases so holding are legion and need not be cited. They may be found in the annotations of Deering's and West's California Codes which accompany the codification of California statutory laws—section 1280 et seq. of the Code of Civil Procedure. Reference, however, may appropriately be made to the most recent opinion of our Supreme Court, *Rounds* v. *Joint Council of Teamsters* (1971) 4 Cal.3d 888, 892-895 [95 Cal.Rptr. 53, 484 P.2d 1397].

Our trial courts are clogged with cases, many of them involving disputes between contracting parties. One of the principal purposes which arbitration proceedings accomplish is to relieve that congestion and to obviate the delays of litigation.

There are at least two California cases, *Atkins, Kroll & Co.* v. *Broadway Lbr. Co.* (1963) 222 Cal.App.2d 646 [35 Cal.Rptr. 385], and *Frey & Horgan Corp.* v. *Superior Court* (1936) 5 Cal.2d 401 [55 P.2d 203] (upon which it is based), holding that a nonresident party to a contract

---

[2]In the record three of such printed pages, containing paragraphs 3 through 22, are 14 inches long. These pages contain all of the paragraphs with which we are interested on this appeal.

could be compelled to come into California where an action on the contract was pending and submit to a California arbitration previously agreed to in the contract. If a nonresident must come into California to submit to a previously agreed-to arbitration here, it may be difficult to rationalize a rule to the contrary denying the obligation of a California citizen to submit to a previously agreed-to arbitration in another state. *Atkins, Kroll & Co.* is also reported in 12 American Law Reports 3d 880. In the note appended to that report (on p. 901) it is said: "The legal effect of an agreement to submit disputes to arbitration in a foreign jurisdiction is based upon the concept that such agreement constitutes consent by the party so agreeing to the jurisdiction of the courts in that jurisdiction for the purpose of enforcing, in some way, that agreement." But the same note adds (on p. 903): "Although there is some authority for the view that a court has the power to enforce an agreement to arbitrate in a jurisdiction other than the forum by compelling a resident of the forum to go into the other jurisdiction to arbitrate, *the majority of the courts faced with this matter have held otherwise.*" (Italics ours.) The "forum," however, is simply the state where litigation is pending, or to be pending sometime in the future. When jurisdiction over contractual litigation might lie in several states the situs of the "forum" could depend upon which party filed an action first. In a proper case, i.e., a case where parties to a contract, bargaining on a fair and equal basis, have agreed upon a state where arbitration should take place, the advantages of enforcement of such agreement could clearly outweigh the disadvantages of a rigid rule declaring the state of the forum to have superseding jurisdiction. (See also Code Civ. Proc., § 1281.4.)

In this case the trial court stated: "It would seem somewhat doubtful that as a practical matter of expediting determination of controversy a trip to New Jersey under all the circumstances would bring an early end to this proceeding."

The trial court cited *Commercial Factors* v. *Kurtzman Bros.* (1955) 131 Cal.App.2d 133 [280 P.2d 146] (hg. den.), where the California courts held a New York arbitration confirmed by a New York court to be invalid against a California citizen. In that case the equities were different. We are not sure they were so different as to make the cases distinguishable, prompting a different rule here. We take judicial notice of the fact that the construction of the Black Butte Dam was a multimillion dollar job. Brewster is a New Jersey corporation. Nevertheless, we think it is proper to assume that not a great deal of its business is transacted in its "home" state where the construction of dams and other large earth-moving jobs must be comparatively rare. It is common knowledge that hundreds of this country's corporate giants have incorporated under the laws of New

Jersey, Delaware and other states along or near the eastern seaboard for reasons and corporate advantages which are entirely irrelevant to the physical work they perform and for which they enter into contracts or subcontracts.

We have mentioned some of the aspects of contracts of adhesion. There is another and very dangerous one which can be envisaged were such a contract to be employed by a corporation "home" based in a jurisdiction far distant from the place where its work is performed to enforce an arbitration clause in the state of origin.

Usually, or in any event frequently, the arbitration clause will be broad enough to encompass every conceivable contractual controversy between the contracting parties. When that occurs the arbitration clause supplants all access to the courts of the jurisdiction into which the maker of the contract of adhesion takes and transacts his business. Using the instant subcontract as an example and assuming that all of Brewster's subcontracts contain the same clause, to specifically enforce such a contract would be to furnish Brewster with quite a weapon. In the matter of commuting between home and place of work an "artificial person" (the denomination which the law accords to corporations) has a distinct advantage over a natural person. A skepticism is born when we read paragraph 13 as to whether it was written as Brewster wrote it for the purpose of expeditious disposition of controversies with its subcontractors. Its plan, it is suggested, may have been designed to effectuate a more unilateral benefit to itself.

". . . The laws with reference to arbitration were passed primarily for the purpose of expediting and facilitating the settlement of disputes and to overcome delays caused by litigation. *They are not enacted to provide a means of creating* delay [citations]" (*Pneucrete Corp.* v. *U.S. Fid. & G. Co.* (1935) 7 Cal.App.2d 733, 740 [46 P.2d 1000] (hg. den.)) (italics ours), and thus, we add, discourage subcontractors with possibly legitimate claims from urging such claims because of the expense involved.

We think the courts would and should scan closely contracts which bear facial resemblance to contracts of adhesion and which contain cross-country arbitration clauses before giving them approval.

The order appealed from is affirmed.

Regan, J., and Bray, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 25, 1971.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.